with the court's permission, I would like to reserve two minutes for rebuttal. Yeah, you've got a clock in front of you. The issue here before the court today is whether or not the district court erred by granting, by denying Mr. Hardy's motion to suppress the evidence. And really there's two things going on here today. The first is whether or not Mr. Hardy had a reasonable expectation of privacy in the hotel room. And then secondly, if he did, whether the government has met their burden of showing that any exceptions applied for the illegal entry and subsequent search. There's two components to the expectation of Mr. Hardy's privacy. I thought he said okay to come in. I mean, he said, I'd like to talk outside. And then he didn't have his ID on him and the agent said, and so he goes back in. He wants to go back in and the agent said, can I come with you? And he says yes. So why isn't that the end of it? Well, turning to that, turning to the issue of consent, first of all, the government would have to show that that consent was voluntary. And given the circumstances of the case surrounding the circumstances before that even happened, there was no voluntary consent. They had done so? There was no evidence in the record that they had any weapons. Cuffs on him? Not at that time, but however, they woke Mr. Hardy up from a deep sleep. They entered the room using a master key card. Can you hold a minute? The clock isn't counting down. Sometimes you luck out. Okay, great. That's great. So going back to the circumstances surrounding the approach to Mr. Hardy, they used their master key card to enter the room. There were two security officers and four DEA agents. That would be a pretty good argument, except he says, no, I don't want to talk to you. And they sort of come in, barge in, and say, can we stay here? But he doesn't. He has the wherewithal to say, no, I've got to talk outside. So we know he knows how to talk back to them. We know he's not that sleepy or surprised if he just says, oh, yeah, come on in and look around, have a field day. He goes out, and then he says, they ask him for ID. He says, I need to go back in. The officer says, can I come with you? And he says, yes, I'm here. Well, again, the circumstances leading up to that is Agent Consnett, the DEA agent who was leading the investigation, said he was talking to him in the hallway for a while. The guy is in his bathrobe and his underwear talking to six agents and security officers in his bathrobe. He's clearly not free to leave. They never told him, you don't have to talk to us. They never advised him of his Miranda rights. They never gave him any kind of indication that they could get a search warrant. And at some point during the conversation, Agent Consnett... He's not stupid. He knows that these are police and that they might get a search warrant. They could arrest him if he says, you know, and he sort of stands up to them. He sits around. He doesn't ever say, oh, look, I'm embarrassed. Let's go into the room. You know, he does stand up to them. But at the point that Agent Consnett asks him for his idea, it's not... He doesn't feel like he has a choice. It's not like... Sure he has a choice. He says, no, you can't come in. You know, I can either stay here with no ID or you can let me go in and get my ID, but I'm not going to let you come in the room, just like I said before. Well, given the circumstances... He said it once. Why can't he say it again? Well, given the circumstances, you know, the agents have been pressuring him in the hallway. They've been talking to him for a while, and they say, we need to see your ID. What reasonable person is going to say no? So he said, okay, I'll show you my ID. And then... Well, I mean, to tell you the truth, if it had been me, I would have said, sure, don't... You know, we're not going to talk in the hallway. Come on in. And, you know, this is sort of... You know, so we know that he has some experience and he's, you know, he's a little savvy about this. Right, right. But even so, when there are six agents talking to him, ask for his ID, and then they insist they have to accompany him into the room for him to get his ID for security reasons. And... What was his... At that point, what was the basis for his expectation of privacy in the room? He'd overstayed. And... Well, in terms of his expectation... Where were we with that issue then? Well, in terms of his expectation of privacy in the room, he believed... He subjectively did. Yes, he believed... But objectively... And I think the district court even found, you know, there might have been evidence of subjective. But objectively, the district court clearly erred in finding that there was facts that showed it was not objectively reasonable. First of all, the district court never cited to the testimony of the front desk person who apparently took the call from Toilolo, who tried to extend the room. And he testified, this is Ken Nakamoto, that he can extend the room without any approval. If it's an extension for cash, he doesn't have to take the cash before the room is extended. He just tells the person to come in at some point and pay the cash. The district court relied on the testimony of another front desk person who said that it was her policy to only extend the room if she receives cash. However, she did not submit any written policy from the hotel, showing that was the hotel policy. The district court also relied on the security director's testimony, Eric Ambrozich, that it was his understanding if the person doesn't pay the cash, then they're out of the room. However, the district court ignored several other pieces of Ambrozich's testimony where he indicated that that's not necessarily true. In other parts of his testimony, he says that the hotel may extend the room without the guests paying cash. If they were paid up to date, they might extend the room. And then Ambrozich also testified he went to the room to confirm that the person was still there. He wanted to know what was going on in the room, and he was going to make his decision on whether to leave based on what was going on in the room. He said it depends on what they see in the room, whether or not they'll allow him to leave. They'll allow that extension. So, and this was... Who had the burden to establish that the hotel policy was to extend? It was the defendant's burden. Okay. He said that she didn't come in with any written statement of policy. That's correct. Well, so how does that cut? Well, there was testimony from this other front desk person who said that they would allow the extension of the room without payment of cash. And indeed, there was a notation made in the record at some point extending the room from January 3rd, which was the date of the search, to January 5th. And in addition, even if there was no objective, reasonable belief that they could stay in the room, the hotel still had to take affirmative steps to repossess the room. And in this case, they did not do that. Ambrosich testified that he went to the room because he wanted to find out what was going on. Now, he did tell the agents, yes, I'm intending to evict them, but he took absolutely no steps to evict Hardy. Why wasn't admitting the agents tantamount to eviction? I mean, if you've got somebody in the room who doesn't belong there, why wouldn't the hotel, by feeling free to enter with a master key, indicate that they had taken constructive control of it? Well, even though he entered with the master key, he did not take possession of the room. When Mr. Hardy said, I want to talk to you outside of the room, they said, sure. You know, they didn't say, no, this isn't your room any longer, you don't belong here. Nobody ever took those kinds of steps. And they know how to take those kinds of steps because later when Toy Lolo showed up, they actually filled out a no trespass form, took a picture of her, told her she could not come back onto the property again. They didn't do that with Mr. Hardy because they wanted to find out what was going on in the room. They wanted to find out what these suspicious criminal activities were. Ultimately, he goes back to the room, the backpack is there, but the backpack doesn't say methamphetamine on it or anything like that. It's just a backpack, right? That's correct. Much like, you know, a normal travel pack or something like that. It is the fact that he gets arrested in the room which is just a matter of timing, right? There's nothing that they found in the room that caused the arrest. No, but they wouldn't have even been... No, no, there's no but about it. I just want to make sure I got my facts. Yes, yes, that's true. So let's say the timing had been slightly different and instead of him going back to the room, he says, no, no, you can't come back with me, and he stands him off at the door. And then the information comes through. I think he got arrested because he got something through the wire, right? Right. They did a criminal check on him and found he had a traffic warrant. That's right, the traffic warrant. And at that point he's having an arrest. So let's say this had all happened. He had said, no, you can't come into the room. I'm not going to go back to get my ID. I'm going to stand here. If you want my ID, you're going to let me go in by myself. And then having that standoff, he gets arrested outside the door. So let's say that had happened. What difference would that make? You still have a backpack in there that is in the room that at that point he has questionable, I mean, let's say he has some sort of continuing interest in it. But once he gets arrested, it's gone. The backpack is still sitting in the room abandoned. So how does any of this make any difference? How does the fact that he goes back make any difference? Well, but the fact is that, you know, the reason they got into the room and got to the backpack in the first place. No, no, let's say he had. Let's say we run the story differently. And let's say he had stood him off and said, you can't come into the room with me. And as they're sitting there haggling about that, the news comes in, there's a warrant. They say, okay, buddy, you know what? You're under arrest for this traffic warrant. Follow the story with me. Okay. So at that point, he's under arrest. He gets taken off in handcuffs. There's still a backpack in the room. At that point, they surely can come in because they've got the hotel guy there saying, go in. It's now our room. They get the backpack. So how is your client helped by any of this other front business? Well, even if they seized the backpack in the room, they would still have to show that there was, you know, some inventory search practices or something that would allow them to get that backpack. It's a backpack abandoned in a room at the hotel. It would be sort of like, let's say you stayed at a hotel here in Honolulu and you checked out and you left your laptop, right? The hotel wouldn't just sort of leave it there for the next guest to take. They would take possession of it. If they thought that it's contraband, which of course wouldn't be in your case, but let's say, you know, for some reason they thought there was something there, they would call the police. Or if they thought there was something, gee, we can't find the owner and we've got this valued piece of property, they would call the police and say, hey, you know, we have this piece of property. Why isn't that how it would play out? We've got this backpack there. The guy has been arrested. We need the room for other guests. Here, take the backpack. Unless you have any of this front stuff makes any difference for you, how it helps you. For one thing, the district court did not rely on the fact that, okay. Help me out here. Okay. The government would have to show that they would have used some kind of policy or procedure or practice and they would have done an inventory search and they would have looked inside the backpack. Who is they? The government. Well, I'm sorry. The hotel is the one that at that point has the room. Well. And they've got police with them and the police come in and they see this backpack and the hotel people say, you know, of course it's not our backpack. We don't want anything to do with our backpack. You guys take it. And the police certainly would open it up and, you know, make sure it's not a bomb. In that case, the backpack isn't really abandoned. It's because they've taken him into custody that the backpack is there. So it's not like he just left it behind. And, indeed, the police went on or the agents in this case went on to get a search warrant because they knew they needed some way to get into that backpack and search it. Right, but that seems to be the problem, I think, that the Chief Judge is pointing out, that really it's only the police getting possession of the backpack. That's the only thing that matters. Once they've done that, they had a dog sniff to get the probable cause for the warrant and everything else after they get possession of it seems just fine. But the problem is how they got to that point, and it's illegal how they got to that point. So everything that happens after their illegal conduct should be thrown out as tainted. Once they entered the room, then everything that they saw or touched or whatever is illegal. Yes, that's correct. It should stop at the door. Crossing the threshold. Yes, that's correct. I see I'm way out of time, yours. Thank you. We'll hear from the government. Good morning, Your Honors. Mark N. Seong, Assistant United States Attorney for the District of Hawaii. In this case, the district court correctly found that the defendant failed to meet his burden of demonstrating that he had a subjective expectation of privacy that was objectively reasonable. The district court founded its findings without any clear error on these factual findings. There was no payment made of any kind to the hotel on the day in question. Well, but there wasn't time because it wasn't due until 1 o'clock according to testimony that, as I read the record, it didn't seem like there was any basis to reject it. The only testimony that came about there being time to 1 o'clock was from Christine Toilolo. You're going to have a hard time. I don't think there's any person in this room who hasn't overstayed a hotel by a few minutes because of business meeting and the like. And I think we all expect that when we're sort of late checking out, you know, maybe the hotel will charge us a few extra dollars for overstaying it, but we don't expect the hotel three minutes after or five minutes after noon, let's say the checkout time is noon, to come in, gather up the stuff, and empty the hotel room. I mean, it's just not common expectation, particularly not somebody who's been there for a long time. And, you know, putting aside the whole question whether they called down and what information they got, you know, five or ten minutes after checkout time, the hotel can come in, and you think we'd write our opinion like saying that? Well, I agree, Your Honor, under normal circumstances, but there was a reason why the defendant in this case went through this system and this process that he had developed over those several days. But the general principle here is, you know, is the hotel, if you overstay, you know, let's say you're paid up. It's one thing if you're sort of way in our ears and they've done you for money and you haven't paid it and, you know, your credit card expired, you know, whatever. If any of that stuff happens, then it's a different situation. But you're up to date on your payments at the hotel, and you're five minutes past your checkout time, and you're going to say, well, you sort of instantly lose your, right, expectation of privacy and everything. I mean, I don't think there's a person in this courtroom who hasn't had that experience. You know, you're late for a meeting, you know, you miss your cab or, you know, something like that, and you get to the hotel a few minutes late. I don't think anybody expects at that point you're going to walk into your room and you're going to have them sending their card and your stuff out. It's just not how hotels operate. Well, the expectation is to be viewed, according to the case law, based on what the hotel's policy is and how they act on it, not what the... But that would be a weird policy, a policy, a hotel that starts moving your stuff out and takes a position that the minute you... I mean, it's one thing to say, look, we'll charge you an extra day or we'll charge you half a day or something like that. Some hotels will do that. They say, look, we have a strict policy, and if you miss it, sorry, buddy, we... you know, you have to pay for an extra day. That will happen. But we can go in there and just toss your stuff out and, you know, if you're not unpacked, we can sort of throw everything into a basket and move you out. I don't think that's the way hotels operate in this country. Maybe in other countries. You know, there may be different customs in other countries, but not in this country. Well, I think the security director was very clear in his testimony, and the district court found that their policy was, as of noon at 5... Was there any instance, did he give any instance where a guest had ever been treated this way? Where a guest, where they had come in five minutes or ten minutes after the expiration of the time and they'd actually sort of thrown the person's possessions out? I don't believe there were any other instances cited. I'd be willing to, if I were a betting man, I'd be willing to bet good money at long odds that it had never happened in the hotel's history. It could be, Your Honor, but even if... I don't think this is your strongest point. And it may not be, but my next point was going to be, even if it was a subjective, reasonable expectation, the fact of the matter is it really was irrelevant. Particularly the guy still in the room. I mean, it's not like you sort of lay to him, you know, sitting there in your pajamas, and they come in and say, OK, buddy, you know what? You can't even have time to get dressed. We're going to take out your stuff and we're going to urge you out of your pajamas. You know, a hotel that did that would get sued. Well, I don't think that was their intent, to kick you out of your pajamas. Well, obviously that's what they were doing. The security guy comes in there and barges in. You know, if they don't take the position that they can actually physically take him out, then, you know, where's his policy? Why don't you go on to something more fruitful for yourselves. Thank you, Your Honor. The bottom line is that, pursuant to the hotel policy, the room had lapsed. The hotel security director had intended, and he had relayed to the DEA his intention, to evict at that time. The defense says that there were no affirmative steps taken. Well, he may have had the intention to evict, but I don't hear where he in fact evicted. I don't hear where he ever said, OK, you are out of this room. The director, you know, maybe he's justified in opening the door. I still think that that is highly questionable. A few minutes after the time has lapsed, he can actually go barging in without getting sued. I think at that point you've got a real problem. But he walks in, and there's the guy in his robe and pajamas. And he doesn't say, you know what? This is no longer your room. You are out of here. You're gone. He doesn't say anything like that, does he? No, he doesn't. The record doesn't show that. But as Judge Fisher indicated, using the master passkey to open the door, I think it's pretty clear what the act is at that point that the hotel is- No, it's not clear. It's clear. It could be an oops. We thought you were gone. If he wants him out, if he wants to evict him, doesn't he at the very least have to say, you are evicted? Doesn't he at least have to tell him this is no longer your room? Doesn't he at the very least have to say, gee, you know, this is no longer your room, unless you run right down or right now hand me over the cash to keep the room for the next Sunday? Your Honor, it was clear to Mr. Hardy, and here's why. Because there's testimony in the record that Mr. Hardy said he was desperately trying to call Miss Toy Lolo, wondering where she was and what had happened, because he thought the room had been extended. So he knew he was getting kicked out. That's why he was calling Toy Lolo, saying, where are you, what happened? It was clear to Mr. Hardy. He knows that he's about to get kicked out, but I was asking a different question. If the position is, look, the hotel has reasserted possession of this room, it's no longer yours, doesn't he have to say that? Doesn't he have to say, okay, look, no more money, no money, you're out. This is now our room. We're in here to clear it out. Does he ever say that? This was an ambiguous gray area where if he sort of comes up with the cash right then, they can say, okay, in that case you'll stay. No, it wasn't that case, Your Honor, because when the security director was already in the room, he testified that he got a call from the front desk saying Miss Toy Lolo was down there with the cash trying to extend the room, and he said, no, we're not extending. That was just two minutes after they'd gotten into the room. Let's say that the initial entry into the room with the master key was unlawful in some sense. How do you save your case from that point forward? Well, Your Honor, to pick up where you were questioning defense counsel, the defendant did voluntarily give consent. So is there some taint that just persists after the initial unlawful entry? I don't believe there's any taint when the defendant himself consents. And there are ñ you know, this issue was not raised in the district court. And so my first ñ Which issue? The voluntariness of the consent. This was not raised before the district court. This was raised for the first time on appeal. So our first argument is that they've waived that issue for the obvious reasons. The district court did go through the Kim factors, the Washington factors, which were raised in the defendant's brief. The defendant was found not to be in custody. There were no guns drawn. Handcuffs were not on him. He wasn't given his Miranda rights. He wasn't told they could go and get a search warrant. None of the factors which would show that the consent was not voluntary. But the most telling is the defendant's own statement at pages 90 and 91 of the excerpts of the record, where he says, no, no, problem, come on in, the room's all clean, look around, I don't care everything but the backpack. It was clearly voluntary consent at that point. And so anything that might have happened that may have been improper up to that point, I think is cured by the defendant's clear voluntary consent at that point. After he gives consent, he abandons the backpack. The court found clearly he abandoned the backpack. The court made a specific finding that he was not credible in his statements regarding ownership of the backpack when he was going back and forth saying it was Toi Lolo's, it was his, back and forth ultimately saying it belonged to Toi Lolo. So he abandoned the backpack. There was no reason or no need for the agents to get a warrant at that point, but acting as they did throughout this case in an abundance of caution. What difference does it make, that back and forth, what difference does that make? Well, it went to his credibility, as the district court found, and he didn't believe that his statement as to whose backpack it was. And so he said in the end, your final statement was you said it belonged to Toi Lolo, then you've abandoned the backpack. Let's say he says it's his backpack. What difference does that make? Well, if he said it was his backpack, then there would have to potentially be a warrant or some other mechanism, whether it was search incident to arrest or an inventory search. They got a warrant after the dog sniff, right? Correct. They didn't remove the backpack. Correct. And they have arrested him and removed him, and the backpack is in the hotel room, which at that point doesn't belong to him. Correct. So what difference does it make what he says whose it belongs to? There's his backpack sitting there with no tethers attached. It doesn't under those prongs. When we're talking about inventory search, search incident, it wouldn't matter what he said. Well, no, search incident is a whole other kind of warrant. You're not relying on the officer didn't search the backpack right when they arrested him. That would be search incident to arrest without a warrant. They just need some mechanism to have lawfully seized it. I assume your position is once he was arrested, if he had claimed the backpack was his, they said, okay, well, let's gather up your stuff, sir, because you're going with us to the station. And if he says it's not yours, then it's abandoned. Correct. So they've got to be their ways. I don't know why you're engaging in this dispute as to which is true and which is not true. No, I'm not. You see what I mean? You've got to be ignoring. No, that's my exact argument is that neither way. No, no, your exact argument was it matters that he abandoned it. You're engaging in this dispute as to which it is. It seems to me that your position should be it doesn't matter which it is. I'm sorry if I was unclear, but that is our position. I think you were clear. You were just wrong. Counsel for the defendant, though, said everything that happened, including seeing the backpack in order to have access to it at all, was tainted that it was illegal thereafter. So what's your response to that? Let's suppose we find that it wasn't voluntary consent. So once they came in the room, they were there illegally. What rescues the backpack? You're saying, well, it's abandoned, or you're saying you're invoking some other grounds. But if just getting in there and forcing the situation and seeing the backpack, why isn't that enough? Under that scenario, and it would still be an inevitable discovery situation based on an inventory search, that backpack still would have been seized, would have been documented, the contents and so forth, pursuant to the DEA policy that was discussed in the short notice. Was that in evidence, the inventory policy? The agent discussed the policy and what the DEA typically does. All right. Thank you. You are out of time. You are out of time as well. If you'd like to take a minute or two, you may have it. Thank you. Just briefly, I want to address the reason that, number one, voluntary consent wasn't raised by the defendant below is it's the government's burden to show the voluntariness of the consent. And the district court did rely on that as alternative grounds for denying the suppression motion. So I don't think there's any question that it's properly before the court. Thank you. And then finally, you know, our position is that everything that happened after the entry into the room was tainted. And there's been no showing that anything would have happened through an inevitable discovery. I'm sorry. Which entry into the room, the first entry or the second entry? Both, actually. I mean, first you have the illegal. Well, if it's after the first, it must be after the second. So you're saying after the first entry. Well, as the court. I'm just asking, you know, there are different points in time. So which, you say everything after the entry. Is it after the first entry? The first entry where they just came into the room with the master key. And then. But nothing happened. They didn't see anything at that point. No, but they, that led to the whole sequence of events where they, he agreed to talk to them in the hallway, allegedly. But you have to win on consent first, don't you? Well, it's the government's burden to show that. But you have to prevail. Whoever, let's, the district. That's correct. As you said. Okay, so let's say the government, on the facts, there was voluntary consent. So then we wouldn't be talking about fruit of any poisonous anything. That's correct. But our position is that the consent was not voluntary. Thank you, Your Honor. Thank you. We're going to hear one more case before the break. Okay, so the next case, this case, the case we just saw, you stand submitted.
judges: Kozinski, Fisher, Watford